**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - -X
JOSE SHOMO,                                      :
                Petitioner,        :
                               :    **MEMORANDUM**
    -against-                                   :    **OPINION & ORDER**
                               :    05 Civ. 10337 (JFK)
ANTHONY ZON, Superintendent,    :
Wende Correctional Facility             :
                               :
                Respondent.       :
- - - - - - - - - - - - - - - - - - - - - - -X

**JOHN F. KEENAN, United States District Judge:**

         Petitioner Jose Shomo ("Shomo" or "Petitioner") brings this pro se application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his state court conviction of murder in the second degree (N.Y. Penal Law § 125.25(1)) and criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(2)), on the ground that he received ineffective assistance of appellate counsel. For the reasons set forth below, the petition is denied in its entirety.

**BACKGROUND**

         On the morning of September 18, 1999, Shomo, a 39-year-old Manhattan resident, murdered Freddy Perdermo ("Perdermo") during a heated argument in the stairwell of their Manhattan apartment building at 2195 Seventh Avenue. On September 24, 1999, Shomo was charged by Indictment Number 7349/99 with two counts: murder in the second degree and criminal possession of a weapon in

the second degree.  After a jury trial in New York State Supreme Court, New York County (Obus, J.), Shomo was convicted of both counts.  He was sentenced, as a persistent violent felony offender, to concurrent, indeterminate terms of 25 years to life.

The following facts, relevant to the instant petition, were established at trial.

On the evening of September 17, 1999, Shomo was in his fourth-floor apartment with his girlfriend, Tanya Gonzalez ("Gonzalez").  Twice during the night, Shomo responded to knocks on the apartment door and spoke with a man whom Shomo later told Gonzalez was his superintendent, Perdermo.  On the morning of September 18, Perdermo again knocked on the door and Shomo went to speak with him.  A few minutes later, Shomo and Perdermo became engaged in a loud argument in the hallway outside Shomo's apartment.

Shomo's neighbor, Joseph Ellams ("Ellams"), lived on the fourth floor and heard Shomo and Perdermo yelling at each other in Spanish right outside his door.  Shortly thereafter, Shomo returned to his apartment and took a small, black gun from inside a pack. Shomo returned to the hallway and resumed the argument with Perdermo.  Gonzalez heard a "pow," followed by the sound of someone tumbling down the stairs (Tr. 552, 594, 622-23)[1], while Ellams heard a "pop."  (Tr. 443, 477-80.)  Shomo then returned to the

_____

[1] "Tr." refers to pages of the trial transcript.

apartment, stowed the gun in the pack, and left again.  When he returned, he had a spent bullet casing between his teeth.  He exclaimed to Gonzalez, "I laid one right on his mother fucking forehead."  (Tr. 552-54.)

Gonzalez and Shomo quickly dressed and fled the apartment and the building.  On the way out, Gonzalez saw Perdermo lying on the third-floor landing.  Shomo and Gonzalez took a taxi to Gonzalez's apartment at 1030 Bayto Avenue, in the Bronx.  During the cab ride, Shomo told Gonzalez that if the police questioned her, she should tell them that he was at her apartment that morning.

About seven or eight minutes after he heard the "pop," Ellams walked out of his apartment and saw Perdermo lying on the landing at the bottom of the stairs with a gunshot wound to the head.  Ellams asked someone to call 911.  Emergency medical technicians arrived on the scene and saw Perdermo lying unconscious in a large pool of blood.  Perdermo's head was bleeding heavily, and one paramedic saw brain matter on Perdermo's forehead and a bullet wound on the left side of Perdermo's forehead.  Perdermo was pronounced dead a short time later.

Four police officers and Detective Edward Clifford ("Clifford") also responded to the scene, and Ellams told them about the dispute between Shomo and Perdermo.  Because the police beleived that Shomo was still in his apartment, the Emergency

Services Unit (the "ESU") was called to make a forced entry. The ESU officers did not hear an answer to their knocks and yells, so they forcibly removed the peephole and inserted a looking device into Shomo's apartment. The door was then forced open, and ESU officers secured the scene and found nobody home. Clifford then searched the apartment and found an envelope addressed to Shomo on the night stand, which he seized. Clifford left to procure a search warrant, and an officer was posted at the front door to guard the premises until the search warrant was issued and executed. Another detective later recovered a pair of sunglasses between Shomo's floor and the one below it.

Early that evening, Clifford returned to Shomo's apartment with the search warrant and found an open box of .25 caliber American Eagle bullets in the top drawer of a nigh stand. He also located Shomo's caller ID box, and he discovered a phone number that appeared at least a dozen times and was later determined to be Gonzalez's number.

After arriving at Gonzalez's apartment that morning, Shomo admitted to Gonzalez's sister, Jakeline Gonzalez ("Jakeline") that he had shot Perdermo and discussed the circumstances surrounding the shooting. The argument between Shomo and Perdermo involved sunglasses Perdermo had sold to Shomo for three dollars but wanted back. A few hours later, Jakeline observed Shomo remove a gun from his pack.

Shomo went back to his apartment in Manhattan that night, arriving after the police had left. He retrieved his caller ID box, clothes, and toiletries, then returned to Gonzalez's apartment. Around midnight, Clifford and other detectives arrived at Gonzalez's apartment after having found the address associated with her phone number, discovered Shomo sleeping in a bedroom, and arrested him.

After being taken to the 32nd precinct station, Shomo waived his Miranda rights and signed a form with his left hand. He then gave a statement in which he stated that he left his apartment around 7:25-7:30 a.m. to go to Gonzalez's apartment and remained there all day. He told Clifford he had no knowledge pf Perdermo's murder.

Clifford returned to Gonzalez's apartment around 2 a.m. to interview her. Initially, Gonzalez corroborated Shomo's story. Clifford told Gonzalez that the statement sounded scripted and falsely told her a witness had reported that a woman of Gonzalez's description had fled the scene at the time of the shooting. Clifford then informed Gonzalez that the shooting victim was dead, and she began crying. Clifford then brought Gonzalez to the 32nd precinct, where she gave a statement implicating Shomo in the shooting.

On September 19, 1999, New York City assistant medical examiner Amy Hart performed an autopsy on Perdermo and concluded he

was killed by a gun placed against his forehead at the time he was shot.  She classified the manner of death as homicide.  In January 2000, Federal Bureau of Investigation examiner Kathleen Lundy compared the bullet removed from Perdermo's head with the bullets seized from Shomo's apartment and concluded that the lead in the fired bullet was analytically indistinguishable with eleven bullets she examined from the box of American Eagle .25 caliber bullets, concluding that all of the bullets came from the same source and an American Eagle .25 caliber bullet had killed Perdermo.

Prior to trial, Shomo moved to controvert the search warrant and suppress evidence recovered from his apartment, including a box of ammunition.  The motion was denied.  Shomo also moved to proceed pro se, and after an inquiry, Justice Berkman granted his request and appointed counsel to be his legal advisor.

In addition, before trial, petitioner alerted the trial court and the prosecution that he intended to raise the defense that he was physically impaired in his left arm and hand, unable to handle or fire a gun, and therefore incapable of having shot Perdermo.  Based on this notice, the court granted the People permission to offer evidence that Shomo had been observed, on occasions prior to Perdermo's murder, handling and firing a gun.  Other evidence was introduced at trial regarding the dexterity of Shomo's left arm and hand, while Shomo also produced witnesses on that subject.

At trial, Jacqueline Shomo Moore ("Moore"), Shomo's sister, was permitted to testify that in June 1999, Shomo came to visit her and, as he stood outside her building, took out a gun from his pants, fired it three times and ran around a corner. In July 1999, former live-in superintendent Oliver Ford Jr. ("Ford") had a conversation with Shomo in front of their building at 2195 Seventh Avenue. Ford informed Shomo that there were "thieves and all kinds of bad people in the building," and that he should be careful. Shomo answered that he had it "under control," and with his left hand pulled out a silver gun with a black handle from his pants. (Tr. 356-57, 359.) Ford, a Vietnam veteran familiar with guns, believed the gun was a .25 caliber automatic and asked Shomo what type of gun it was. Shomo confirmed the gun was a "two five." (Tr. 355, 357, 359, 361-63.)

Following his conviction and sentencing, Shomo timely appealed to the Appellate Division, First Department, in a brief filed by court-appointed attorney Steven N. Feinman, Esq. ("Feinman"). Shomo asserted that the trial court improperly admitted evidence of uncharged bad acts and that the court improperly adjudicated him as a persistent felony offender. On March 27, 2003, the Appellate Division affirmed Shomo's conviction. People v. Shomo, 757 N.Y.S.2d 272 (1st Dep't 2003). On May 29, 2003, the New York Court of Appeals denied Shomo's motion for leave to appeal. People v. Shomo, 100 N.Y.2d 542 (2003).

On May 28, 2003, Shomo filed <u>pro se</u> an application for a writ of error <u>coram</u> <u>nobis</u>, alleging that his appellate attorney had rendered constitutionally ineffective assistance.  Specifically, petitioner contended that his convictions would have been reversed if counsel had included the following claims on appeal: (1) there was no probable cause for the police search of petitioner's apartment; (2) the search warrant that directed the police to search petitioner's apartment alleged inadequate probable cause; (3) the trial court failed to transcribe proceedings relating to the basis for a search warrant pursuant to New York Criminal Procedure Law § 690.40; (4) the People failed to disclose certain material pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>People v. Rosario</u> 9 N.Y.2d 286 (1961); (5) there was no pretrial hearing regarding confirmatory identifications of petitioner; (6) the People failed to provide notice with respect to those identifications pursuant to New York Criminal Procedure Law § 710.30(1)(b); (7) the People failed to prove his guilt beyond a reasonable doubt; and (8) testimony from Ford regarding petitioner's prior bad acts was improperly admitted.  On October 23, 2003, the Appellate Division unanimously denied Shomo's <u>coram</u> <u>nobis</u> application.  <u>People v. Shomo</u>, 767 N.Y.S.2d 65 (1st Dep't 2003).

On or about June 15, 2004, Shomo petitioned the Southern District of New York for a writ of habeas corpus, repeating the

claims in his coram nobis application to the Appellate Division. On March 31, 2005, the Court dismissed Shomo's application without prejudice after finding that Shomo had failed to seek leave to appeal the Appellate Division's denial of his coram nobis petition and therefore had not exhausted his remedies in state court. Shomo v. Maher, NO. 04-CV-4149 (KMK), 2005 WL 743156, at *8 (S.D.N.Y. Mar. 31, 2005).[2]

On May 19, 2005, Shomo sought leave to appeal from the Appellate Division's denial of his coram nobis application. On July 29, 2005, the Court of Appeals denied leave to appeal. See People v. Shomo, 5 N.Y.3d 794 (2005). On December 12, 2005, Shomo filed the present petition for a writ of habeas corpus.

## DISCUSSION

*(I) Standard of Review for 28 U.S.C. § 2254 Cases*

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides the applicable standard of review in § 2254 habeas cases. See 28 U.S.C. § 2254 (2004). AEDPA provides, in relevant part, that to obtain habeas relief a state prisoner must show that the state court's adjudication of the claim on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.

---

[2] This case was transferred to Judge Sullivan on September 11, 2007 and ultimately reassigned to me on January 2, 2008.

9

§ 2254(d)(1); see also Kane v. Garcia Espitia, 546 U.S. 9, 10 (2005).

A state-court decision is contrary to Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision constitutes an "unreasonable application" of clearly established federal law if (1) "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

For a petitioner to prevail under § 2254, "[i]t is not enough that the habeas court has a 'firm conviction that the state court was erroneous.' Rather, the reviewing court must conclude that the state court's application of the law was 'objectively unreasonable.'" Cooper v. United States, No. 04 Civ. 1381 (JFK), 2006 WL 2390266, at *5 (S.D.N.Y. Aug. 16, 2006) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)). Further, where a state

prisoner's claims were adjudicated on the merits, a federal court must presume any determination of a factual issue made by a state court to be correct. A habeas corpus petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Smith v. Conway, Slip Copy, No. 06 Civ. 7674(RMB)(KNF), 2008 WL 780635, at *7 (S.D.N.Y. Mar. 24, 2008).

*(II) Standard of Review for Ineffective Assistance of Counsel*

Shomo claims that his appellate counsel rendered constitutionally ineffective assistance. The applicable standard for ineffective assistance of counsel claims was established in Strickland v. Washington, 466 U.S. 668 (1984), which is now "clearly established Federal law, as determined by the Supreme Court of the United States." Williams, 529 U.S. at 391. To prevail on such a claim under the Strickland test, the petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) this ineffectiveness prejudiced the defense because "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. The petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

To succeed on this claim under AEDPA, a petitioner must do more than show that he would have satisfied the Strickland test if his claim were being analyzed in the first instance. Bell v. Cone, 535 U.S. 685, 698-99 (2002). "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [court] applied Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699; accord Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004). In determining whether the state court unreasonably applied the Strickland test, a federal court should apply a standard between "merely erroneous and unreasonable to all reasonable jurists." Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000) (internal quotation marks and citation omitted). The Second Circuit has observed that the Strickland test is a "heavy burden" that is "enhanced by the added hurdle posed by the highly deferential review accorded state court adjudications under" AEDPA. Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003).

Where, as here, a petitioner alleges that his appellate counsel was ineffective for failing to raise certain claims, it is important to note that "the attorney need not advance every argument, regardless of merit, urged by the appellant." Evitts v. Lucey, 469 U.S. 387, 394 (1985) (emphasis in original). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing

on one central issue if possible, or at most on a few key issues."
Jones v. Barnes, 463 U.S. 745, 751-52 (1983); see also Cunningham
v. Henderson, 725 F.2d 32, 35-37 (2d Cir. 1984). "Notwithstanding
Barnes, it is still possible to bring a Strickland claim based on
counsel's failure to raise a particular claim, but it is difficult
to demonstrate that counsel was incompetent." Smith v. Robbins, 528
U.S. 259, 288 (2000). However, "[g]enerally, only when ignored
issues are clearly stronger than those presented, will the
presumption of effective assistance of counsel be overcome." Gray
v. Greer, 800 F.2d 644, 646 (7th Cir. 1986); accord Mayo v.
Henderson, 13 F.3d 528, 533 (2d Cir. 1994). A petitioner "must
show that counsel failed to render professionally competent
assistance in deciding which claims to raise on appeal as well as
demonstrate a reasonable probability of success had those claims
been presented to the appellate court. It will not suffice[] for
Petitioner to show merely that any nonfrivolous arguments were
omitted." Garcia v. Keane, No. 97 Civ. 1622 (JFK), 1999 WL 558144,
at *2-3 (S.D.N.Y. July 30, 1999) (internal quotations omitted).

        In the present petition, Shomo asserts that his appellate
counsel, Feinman, was constitutionally ineffective for failing to
raise on appeal the following seven points: (1) the People failed
to prove his guilt beyond a reasonable doubt (Pet'n: Point IX); (2)
there was no probable cause for the warrantless search of
petitioner's apartment; the search warrant that directed the police

to search Shomo's apartment alleged inadequate probable cause; and the trial court violated C.P.L. § 690.40 when it failed to transcribe proceedings relating to the basis for a search warrant (Pet'n: Points I, II III, and V); (3) there was no probable cause for petitioner's arrest (Pet'n: Point IV); (5) the People failed to provide notice of identifications, pursuant to C.P.L. § 710.30(1)(b), and the court improperly refused to hold a hearing regarding Gonzalez's confirmatory identification of Petitioner (Pet'n: Points VII and VIII); (6) the People failed to disclose certain materials pursuant to <u>Brady v. Maryland</u>, 373 U.S. at 83 and <u>People v. Rosario</u>, 9 N.Y.2d at 286 (Petition: Point VI); and (7) the court improperly admitted Ford's testimony about Shomo's possession of a handgun on a prior occasion (Pet'n: Point X).[3] Shomo essentially repeats the claims he made in his application for a writ of error <u>coram</u> <u>nobis</u>, which was denied in its entirety by the Appellate Division in a summary order. <u>Shomo</u>, 767 N.Y.S.2d at

_____

[3] In addition, Shomo appears to take issue with Feinman's handling of the two appellate claims that he did raise (namely, that the trial court improperly admitted Moore's testimony about Shomo's prior gun possession and improperly adjudicated Shomo as a persistent violent felony offender). <u>See</u> Pet'n at 14-15. To the extent that Shomo claims that Feinman rendered ineffective assistance in his handling of these two appellate claims, Shomo's argument is without merit. A review of the record reveals that these two issues were well-briefed and professionally argued. Feinman submitted a 49-page appellate brief that recounted the facts and argued the law in a light favorable to Shomo. None of the claims that Shomo asserts now and Feinman failed to assert is clearly stronger. That Feinman's arguments failed to overcome highly adverse facts and the applicable law does not render his legal performance constitutionally defective.

65.     The Appellate Division's rejection of Shomo's claims was proper and clearly not contrary to, or an unreasonable application of, Supreme Court precedent.  As discussed below, Feinman was not ineffective in failing to raise the seven issues Shomo raises here, because none of these claims had the slightest possibility of succeeding on appeal.  Each of the claims is discussed in turn.

(1) Sufficiency of Evidence

          Shomo argues that Feinman should have appealed on the ground that his convictions were based on insufficient evidence. The People presented overwhelming evidence of Shomo's guilt at trial.    Two witnesses, Gonzalez and Ellams, heard Shomo and Perdermo loudly arguing in the apartment hallway, followed by the sound of a gunshot. Both witnesses saw Perdermo's body a short time later.  Gonzalez further testified that Shomo retrieved a gun from his apartment during the argument.  After Gonzalez heard a "pow" and someone falling down the stairs, Shomo returned with the gun and bullet casing in his teeth and flatly admitted, "I laid one right on his mother fucking forehead."  That testimony alone was sufficient for a jury to reasonably find Shomo guilty.  Additional inculpatory evidence included expert forensic testimony that established that the bullet found in Perdermo's brain was "analytically indistinguishable" from the bullets recovered from Shomo's apartment; Shomo's full confession to Gonzalez's sister, Jakeline; and Shomo's exhortations to Gonzalez to provide him with

a false alibi.  In addition, Shomo's defense – that he was physically incapable of handling or firing a handgun – was soundly rebutted by the People's evidence.  In sum, there was ample evidence to support the jury's verdict.

(2) Entry and Search of Shomo's apartment

Shomo asserts that the ESU officers' initial entry into his apartment was unsupported by either probable cause or exigent circumstances, and that the warrant subsequently obtained to search the apartment was tainted by the illegal entry.  Shomo also claims that the court failed to transcribe proceedings relating to the issuance of the warrant.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; see also Payton v. New York, 445 U.S. 573, 585-86 (1980); People v. Gonzalez, 39 N.Y.2d 122, 127 (1976).  Thus, warrantless entries, searches and seizures are presumptively unreasonable, and the People have the burden to justify their actions. See Payton, 445 U.S. at 586; People v. Knapp, 52 N.Y.2d 689, 694 (1981).  Exigent circumstances, such as an emergency situation, can justify such a warrantless entry. See Payton, 445

U.S. at 586; <u>People v. Calhoun</u>, 49 N.Y.2d 398, 403 (1980). Courts look at several factors in determining exigency, including: "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry." <u>United States v. Martinez-Gonzalez</u>, 686 F.2d 93, 100 (2d Cir. 1982) (internal quotations and citations omitted); <u>People v. Cloud</u>, 571 N.Y.S.2d 444, 446 (1st Dep't 1991).

Where, as here, law enforcement officers come upon the scene of a murder, "they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978) (internal quotations and citations omitted). The scope and duration of an emergency search must be otherwise limited by and related to the exigencies of the situation. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 25-26 (1968); <u>People v. Cohen</u>, 450 N.Y.S.2d 497, 501 (2d Dep't 1982). Even so, "[t]he police may seize any evidence that is in plain view during the course of their legitimate

emergency activities." <u>Mincey</u>, 437 U.S. at 393.

The police who arrived at Shomo's apartment building were confronted with a highly exigent situation. Perdermo had been shot in the head a short time before. Ellams told the officers that he heard Shomo arguing with Perdermo moments before Perdermo was shot. Nobody interviewed at the scene indicated that they had seen Shomo leave, and the murder weapon was not recovered at the scene. Therefore, the police had reasonable grounds to believe that Shomo might still be in his apartment and armed. Notably, the officers used appropriate restraint, entering and looking around only to the extent necessary to ensure that the premises were unoccupied. The police acted in a manner that was completely appropriate in light of the exigencies of the situation.

Similarly, Shomo's related claim that the warrant to search his apartment was issued without probable cause is meritless. The warrant was not issued on the basis of an illegal "full blown search of the premises prior to obtaining the authorized warrant" or "exclusively" on the unsubstantiated account of Ellams, as Shomo claims (Pet'n at 16, 22-25), but rather was obtained based on information that police officers gathered from witnesses and their own observations. This evidence established probable cause necessary for the issuance. Included in Clifford's affidavit to support the warrant application was testimony from Shomo's sister, Moore, who confirmed that Shomo lived in apartment

4B of 2195 Seventh Avenue and told police her brother had "a long criminal record," a "very bad temper," and a history of complaining about Perdermo. Further support for the warrant was provided by Edwina Timothy, a resident of the building, who attested that she saw a prior dispute between Shomo and Perdermo in the building in September 1999. When Clifford initially entered with other officers, he looked around only to confirm that the apartment was unoccupied. He saw in plain view a piece of mail addressed to Shomo at that address, thus confirming that the apartment was Shomo's residence. Thus, while Ellams was a key witness to the situation, his information was amply corroborated by other evidence that gave police good reason to suspect Shomo had shot Perdermo. Hence, there was nothing improper about the issuance of the warrant, since there was probable cause to believe that property inside Shomo's apartment had been used in connection with Perdermo's murder.

Shomo's claim that Ellams' account was insufficiently reliable to serve as the basis for the warrant is similarly without merit. Police may establish probable cause from an informant for issuance of a warrant. See, e.g., Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964); People v. Griminger, 524 N.E.2d 409 (1988). To rely on such hearsay, however, the People must satisfy the Aguilar-Spinelli test: (1) they must establish that the informant had a basis of knowledge for

the report transmitted; and (2) the informant must prove reliable. _Spinelli_, 393 U.S. at 412-13; _Aguilar_, 378 U.S. at 114; _People v. Johnson_, 66 N.Y.2d 398, 402 (1985).[4] "The separate basis of knowledge and veracity requirements of _Aguilar-Spinelli_ are analytically independent and each must be satisfied." _Lopez v. Greiner_, 323 F. Supp. 2d 456, 473-74 (S.D.N.Y. 2004) (quoting _People v. DiFalco_, 80 N.Y.2d 693, 697). Moreover, establishing reliability "requires a showing either that the informant is credible and that the information supplied may, for that reason, be accepted as true or, in the absence of such showing, that the specific information given is reliable." _DiFalco_, 80 N.Y.2d at 696-97. Reliability can be demonstrated if the informant relays activities of the suspect to which there is "independent verification of sufficient details of that information." _Lopez_, 323 F. Supp. 2d at 474 (quoting _DiFalco_, 80 N.Y.2d at 697) (quotation marks omitted). Although these details "need not be inherently 'criminal in nature,' neither may they be 'merely peripheral to the reported criminal scheme; they must fit within the informant's story of the contemplated crime as activities which are significant and essential to carrying it out.'" _Lopez_, 323 F. Supp. 2d at 474 (quoting _DiFalco_, 80 N.Y.2d at 699). Notably,

---

[4] Although the _Aguilar-Spinelli_ test has been abrogated by _Illinois v. Gates_, 462 U.S. 213 (1983), New York declines to follow _Gates_ on state constitutional grounds, preferring _Aguilar-Spinelli_. _See Johnson_, 66 N.Y.2d at 405-07.

where the informant is an identified citizen informant, and not an unnamed informant, there is "a built-in basis for crediting [] reliability." <u>People v. Hetrick</u>, 80 N.Y.2d 344, 349 (1992).

Here, Ellams was an "identified citizen informant" whose basis of knowledge was clearly established, given that he had lived on the same floor as Shomo for approximately eight months and was a resident of the building for more than twenty years. His recognition of Shomo and Perdermo's voices was well-grounded. Similarly, the reliability of his testimony was beyond dispute. Ellams' testimony was corroborated by Timothy and Moore both as to Shomo's address and the argument. Ellams' statements, in combination with the accounts of other witnesses, were sufficiently reliable to support the issuance of the search warrant.

Finally, Shomo's related claim, that the lower court failed to transcribe proceedings relating to the issuance of the search warrant, is also completely meritless. The minutes of the proceeding were in fact recorded, although there were no witnesses examined in relation to the application for the search warrant. In evaluating an application for a search warrant pursuant to C.P.L. § 690.40, "[w]hile it is true that the issuing Judge may examine, under oath, any person who possesses pertinent information in order to determine reasonable cause, a Judge is not required to conduct such an examination if he or she is satisfied that the submitted affidavits establish reasonable cause (C.P.L. § 690.40[2])."

People v. Israel, 555 N.Y.S.2d 865, 867 (2d Dep't 1990); see also People v. Taylor, 73 N.Y.2d 683, 688 (1989). Here, Clifford's application for the warrant was based on the information supplied by Ellams, Timothy and Moore. As discussed, these witnesses were reasonably determined to be credible and had bases of knowledge. Clifford's affidavit, standing alone, established probable cause, and no further testimony was required. Thus, there was no failure to comply with C.P.L. § 690.40.

In sum, the police's initial warrantless entry and the subsequent issuance of the warrant were not violative of the Fourth Amendment, and the transcription of proceedings relating to the warrant's issuance complied with C.P.L. C.P.L. § 690.40. Feinman properly chose not to raise these meritless issues on appeal.

(4) Shomo's arrest

Shomo argues that there was no probable cause for his arrest. He claims that there was nothing to connect him to the crime when he was arrested on September 19, 1999, since the bullet had not yet been removed from Perdermo's skull and matched to the ammunition recovered in his apartment. However, there was other evidence which was sufficient to establish probable cause for the arrest.

A police officer may arrest a person for a crime "when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." C.P.L. §

140.10(1)(b). "Reasonable cause means probable cause." People v. Maldonado, 86 N.Y.2d 631, 635 (1995) (citing People v. Johnson, 66 N.Y.2d 398, 402 n.2 (1985)); see also Draper v. United States, 358 U.S. 307, 310 n.3 (1959) (probable cause and reasonable grounds "are substantial equivalents of the same meaning"). "Probable cause exists when an officer has knowledge of facts and circumstances 'sufficient to support a reasonable belief that an offense has been or is being committed . . .'" Maldonado, 86 N.Y.2d at 635 (quoting People v. Bigelow, 66 N.Y.2d 417, 423 (1985)). Establishing probable cause for an arrest "does not require proof to a mathematical certainty, or proof beyond a reasonable doubt." People v. Mercado, 68 N.Y.2d 874, 877 (1986). Instead, probable cause exists where an officer has sufficient information that it is "at least more probable than not that a crime has taken place and that the one arrested is its perpetrator." People v. Carrasquillo, 54 N.Y.2d 248, 254 (1981); People v. Rivera, 855 N.Y.S.2d 502, 504 (1st Dep't 2008).

As noted above, by the time of Shomo's arrest, the police investigation of Perdermo's murder had netted significant evidence that pointed toward Shomo as the culprit. Ellams heard Shomo arguing with Perdermo, and he also heard "a single, loud pop" before seeing Perdermo lying in the stairwell with a gunshot wound to his head. The noise Ellams heard corresponded with Perdermo's gunshot wound, as the forensic evidence ultimately proved. Ellams

also identified Shomo's apartment, and other witnesses established that Shomo had a contentious history with Perdermo, a bad temper, and a significant criminal record. On this basis, the police obtained the search warrant for Shomo's apartment, where the ammunition was found. By the time police tracked down Shomo at Gonzalez's apartment, they had ample evidence to support the arrest. Accordingly, there is no merit to Shomo's claim that he was arrested without probable cause.

(5) Discovery obligations

Shomo claims that Feinman was ineffective for failing to challenge the manner in which the People turned over certain documents before the start of his trial. Specifically, Shomo argues that the People "delay[ed]" turning over several different pieces of evidence, including transcription of police radio and 911 calls; certain police reports; photographs; and hospital records. Notably, Shomo does not contend that the prosecutor failed to give him these documents. He admits he received them "on or about October 5, 2000." (Pet'n at 39.) However, he claims that he did not receive them at such a time "when they could have been used effectively." (Pet'n at 39.) Accordingly, Shomo claims the manner in which the People conducted discovery in his case violated his rights under both Rosario, 9 N.Y.2d at 289-90, and Brady, 373 U.S.

at 83. (Pet'n at 31-40.)[5]

Under New York law, the People must disclose prior recorded statements of prosecution witnesses about the subject of the witnesses's testimony to the defense "after the jury has been sworn and before the prosecutor's opening address . . . ." C.P.L. § 240.45(1). The purpose of this disclosure requirement is to afford a defendant a fair opportunity to cross-examine the People's witnesses at trial. People v. Poole, 48 N.Y.2d 144, 149 (1979); Rosario, 9 N.Y.2d at 289. Shomo concedes that he received the People's Rosario materials "on or about October 5, 2000," which was the day before the jury was sworn and five days before the prosecutor's opening statement. "There is no requirement that the People furnish Rosario material to a defendant prior to commencement of trial." People v. Allen, 484 N.Y.S.2d 830, 831 (1st Dep't 1985) (internal citation omitted); see also Catterson v. Rohl, 608 N.Y.S.2d 696, 698-99 (2d Dep't 1994) ("The statute is clear on its face that a prosecutor is not obligated to provide a defendant with copies of witnesses' statements until such time as trial has commenced, and there is no provision contained in the

---

[5] Although Brady violation claims are subject to federal review, Rosario claims are not because they are based solely on state law. See Landy v. Costello, 141 F.3d 1151, No. 97-2433, 1998 WL 105768, at *1 (2d Cir. Mar. 9, 1998); Ferrer v. Artus, No. 04 Civ. 5063(RMB)(DF), 2008 WL 2434143, at *3 (June 11, 2008). However, Shomo's contention that Feinman was constitutionally ineffective by failing to assert a Rosario claim on direct appeal does make out a federal claim.
.

statute which would give the court authority to vary that statutory time frame."). Thus, the People fulfilled their obligations under <u>Rosario</u>, and Shomo cannot reasonably claim that he received insufficient time to prepare his defense. <u>See Gibbs v. New York</u>, No. 01 Civ. 5046 (DLC)(HBP), 2002 U.S. Dist. LEXIS 25102, at *52 (S.D.N.Y. Sept. 11, 2002).

Shomo's claim that the timing of the People's disclosure of these documents also violated the due process requirements of <u>Brady</u> is similarly without merit. To establish a <u>Brady</u> violation, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence was suppressed by the State, either willfully or inadvertently; (3) that prejudice ensued. <u>See DiSimone v. Phillips</u>, 461 F.3d 181, 192 (2d Cir. 2006) (citing <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)). A <u>Brady</u> violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed. <u>Strickler</u>, 527 U.S. at 280 (citation omitted). This Circuit "ha[s] have never interpreted due process of law as requiring more than that Brady material must be disclosed in time for its effective use at trial . . ." <u>Coppa</u>, 267 F.3d at 142 (citing <u>Leka v. Portuondo</u>, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of [the] disclosure Brady and its progeny require, except in

terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.").

Here, Shomo has failed to explain why the timing of the disclosure prevented him from making effective use of the evidence at trial. There is simply no indication that the People did not disclose relevant <u>Brady</u> materials or disclosed them at such a late date that Shomo was precluded from making use of their exculpatory value. Further, Shomo has made no attempt to establish that the evidence in question was in fact exculpatory or impeaching. Similarly, Shomo has not shown how earlier disclosure of the purported <u>Brady</u> materials would have resulted in a more favorable outcome. In sum, Shomo's claim that he was deprived of due process by the People's failure to abide by their discovery obligations is completely without merit.

(6) <u>Confirmatory Identifications</u>

Shomo claims that his appellate counsel should have argued that the lower court improperly rejected his request for a <u>Wade</u> hearing, pursuant to <u>People v. Rodriguez</u>, 79 N.Y.2d 445 (1992), to determine whether Gonzalez and Ellams were sufficiently familiar with him to render confirmatory identifications. He also argues that the People improperly failed to provide him with notice of the identifications by Gonzalez and Ellams.

Prior to trial, Gonzalez made a photographic identification of Shomo. If a witness recognizes a perpetrator

because of prior familiarity, the people are not obligated to provide notice of a prior identification procedure under C.P.L. § 710.30. See Rodriguez, 79 N.Y.2d at 450-51. "[T]he primary purpose of the notice requirement is to implement the constitutional guarantees by alerting the defendant to the possibility that evidence identifying him as the person who committed the crime may be constitutionally tainted and subject to a motion to suppress." People v. Collins, 60 N.Y.2d 214, 219 (1983). As the Court of Appeals explained in Rodriguez:

> A court's invocation of the confirmatory identification exception is thus tantamount to a conclusion that, as a matter of law, the witness is so familiar with the defendant that there is little or no risk that police suggestion could lead to a misidentification. This is so because, as a consequence of applying the exception, the defendant will be denied a Wade hearing to explore suggestiveness. In effect, it is a ruling that however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant.

Rodriguez, 79 N.Y.2d at 450.

At a pretrial Huntley hearing, the People set forth the basis for characterizing Gonzalez's identification of Shomo as confirmatory, producing evidence of an intimate relationship. According to the prosecutor, Shomo and Gonzalez had been dating "for a month" and in that period she had spent "many hours" with petitioner, including "five or six hours" at his place and "ten hours or so at her apartment" on the day of the murder. (H 2)[6].

---

[6] "H" refers to pages of the pre-trial hearing transcript.

Additionally, the People indicated that Shomo had called Gonzalez on "at least 37 different occasions since he's been in jail." (H 2). There were also voicemails where Shomo stated that he loved Gonzalez and asked her to call him. (H 2-3). Shomo's attorney also sent the prosecutor a letter indicating that Shomo wanted "continued contact with" Gonzalez but "would abide by any decision" she made not to have such contact. (H 3). On these facts, the People argued that Gonzalez's identification was confirmatory and no further inquiry was required. (H 3).

Although defense counsel urged the court to inquire into the "factual issue" regarding the relationship between Shomo and Gonzalez, the court found that it been supplied with "some very detailed allegations" regarding "an extended relationship" between Gonzalez and Shomo and concluded that there was "no reason to have a hearing" unless the court was "told specifically what the issue might be." (H 17). The defense subsequently did not assert any additional reason for a <u>Wade</u> hearing.

Based on this record, the court properly determined that Gonzalez was well-positioned to give a confirmatory identification that did not require notice. Gonzalez clearly had sufficient familiarity with Shomo such "that there [wa]s little or no risk that police suggestion could lead to a misidentification." <u>Rodriguez</u>, 79 N.Y.2d at 450.

Shomo's claim regarding Ellams also has no merit. Ellams

never identified Shomo in a pre-trial photo array or lineup.  Thus, there simply was no basis for appellate counsel to argue that the lower court failed to hold a <u>Wade</u> hearing or that the People failed to give identification notice, pursuant to N.Y. C.P.L. § 710.30, with respect to Ellams.

<u>(7) Ford's Testimony Regarding Prior Bad Acts</u>

Shomo argues that Feinman was ineffective for failing to argue that the trial court improperly allowed Ford to testify about Shomo's uncharged prior bad act.  Under New York law, "evidence of uncharged crimes is generally inadmissable so that the jury does not convict the defendant based on a perceived predisposition towards criminal conduct that is deserving of punishment rather than for guilt of the charged offense."  <u>Yapor v. Mazzuca</u>, No. 04 Civ. 7966 (RCC) (AJP), 2005 U.S. Dist. LEXIS 6597, at *60 (S.D.N.Y. Apr. 19, 2005) (citing <u>People v. Molineux</u>, 168 N.Y. 264, 291 (1901)).  "However, when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule, but only for the limited purpose for which it is relevant." <u>People v. Beam</u>, 57 N.Y.2d 241, 250 (1982).  "Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each

other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial." Molineux, 168 N.Y. at 294. The five Molineux categories have been deemed "merely illustrative, not exclusive." People v. Jackson, 39 N.Y.2d 64, 68 (1976). "Even when admissible for such purposes, however, the evidence may not be received unless its probative value exceeds the potential for prejudice resulting to the defendant." People v. Alvino, 71 N.Y.2d 233, 242 (1987) (citation omitted).

Ford testified at trial that, two months before the shooting of Perdermo, Shomo pulled out a .25 caliber handgun with his left hand and told Ford that he was capable of using it. One of Shomo's defenses was that he could not be the killer because he was not capable of holding, let alone firing, a weapon. To counter this defense, the People clearly had the right to offer evidence to show that Shomo was, in fact, capable of holding, and thus using, a handgun. To minimize any prejudice that might arise from admission of the prior act, the jury was given a limiting instruction by the trial judge, which warned them not to infer a criminal tendency from the testimony.[7] The potential for prejudice

_____

[7] Although Shomo now claims that in the course of making the contemporaneous objection to Ford's testimony, "he'd conceded to being able to hold a gun," Pet'n at 51, there is no evidence of any such concession in the record. Shomo's claim is also belied by Shomo's subsequent introduction of evidence, at trial, relating to his purported inability to handle a firearm. See Tr. 992-1156.

was also at a minimum because the conduct in question – Shomo's display of a gun on a prior occasion – was far less likely to inflame the jury than the conduct for which he was on trial, namely shooting Perdermo in the head at point-blank range over a pair of cheap sunglasses. Accordingly, the probative value of the testimony was not clearly outweighed by the danger of prejudice.

Shomo also contends that Ford's testimony was cumulative of testimony offered by Moore, who also testified about witnessing Shomo handle and fire a gun on a different prior occasion. This argument is also meritless. Ford's testimony differed from Moore's, in that it concerned Shomo's possession of a handgun at a different time and place. The People were entitled to present the testimony of both witnesses to rebut Shomo's defense that he could not be the killer because a physical impairment rendered him incapable of holding his weapon. In sum, admission of Ford's testimony was not improper, and Feinman appropriately chose not to raise this issue on appeal.

## CONCLUSION

The points raised by Shomo in the present petition are meritless and clearly would not have succeeded on appeal. Accordingly, Feinman was not ineffective for failing to assert these claims. Shomo's § 2254 petition is DENIED.

Because Shomo has not made a "substantial showing" of the denial of a constitutional right, this Court will not grant a

certificate of appealability. <u>Lucidore v. New York State Div. of Parole</u>, 209 F.3d 107, 112 (2d Cir. 2000) (citing <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)). However, Shomo has the right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. <u>See</u> 28 U.S.C. § 2253; <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003). This case is closed, and the Clerk is respectfully directed to remove it from the docket.

SO ORDERED.

Dated:          New York, New York
                August  | , 2008

                                JOHN F. KEENAN
                                United States District Judge

33